# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 4, 2026

Lyle W. Cayce
Clerk

No. 25-10184

Sᴇʀɢɪᴏ Sᴀɴᴄʜᴇᴢ Lᴏᴢᴀɴᴏ,

*Plaintiff—Appellant*,

*versus*

Mᴀʀɪᴀ Iѕᴀʙᴇʟ Hᴇʀʀᴇʀᴀ Pᴇʀᴇᴢ,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:24-CV-475

_____

ON PETITION FOR REHEARING

Before Eʟʀᴏᴅ, *Chief Judge*, and Cʟᴇᴍᴇɴᴛ and Hᴀʏɴᴇѕ, *Circuit Judges*.
Pᴇʀ Cᴜʀɪᴀᴍ:[*]

The petition for panel rehearing is DENIED. Because no member of the panel or judge in regular active service of the court requested that the court be polled on rehearing *en banc* (Fed. R. App. 40 and 5th Cir. R. 40), the petition for rehearing *en banc* is DENIED. We WITHDRAW our prior

_____

[*] This opinion is not designated for publication. *See* 5ᴛʜ Cɪʀ. R. 47.5.

opinion, *Sanchez Lozano v. Herrera Perez*, No. 25-10184, 2024 WL 1990820 (5th Cir. July 9, 2026), and SUBSTITUTE the following:

Sergio Sanchez Lozano appeals the district court's denial of his petition for the return of his young son, M.A.S., to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction. Because the district court did not err in its determination that the child's return to Mexico would expose him to a grave risk of physical or psychological harm or place him in an intolerable situation, we AFFIRM the district court's denial of the petition.

I

A

We take these facts from the district court's findings. Those factual findings are, in turn, "based on an evaluation of the testimony and evidence" from the district-court hearing.

Sanchez Lozano and Maria Isabel Herrera Perez married in Durango, Mexico, in 2015. After their marriage, Herrera Perez gave birth to their second son, M.A.S.[1] Because M.A.S. was born in El Paso, he has both U.S. and Mexican citizenship.

Sanchez Lozano and Herrera Perez informally separated as early as 2019 and formally divorced in November 2021. The Mexican divorce decree gave Herrera Perez full custody of the couple's two sons. Sanchez Lozano could visit them every other weekend with restrictions. In December 2022, Herrera Perez sought Sanchez Lozano's consent to take M.A.S. on a "pleasure trip" to Texas. Sanchez Lozano signed a "'travel authorization' form," in which he permitted M.A.S. to leave Mexico, enter the United

---

[1] The couple's older son is now an adult and not the subject of this dispute.

States, "and travel for pleasure and return from the United States" to Mexico "during the term of one year."

Herrera Perez brought M.A.S. to the United States in January 2023. "In or around August 2023," the couple's older son informed Sanchez Lozano that the "family would not be returning to Mexico." As the district court found, Herrera Perez has remarried, and she and her new husband rent a home in Fort Worth, Texas, where M.A.S. lives with them.

B

In December 2023, Sanchez Lozano initiated proceedings in Mexico for M.A.S.'s return by filing a Hague Convention petition with the Ministry of Foreign Affairs in Mexico. *See* Convention on the Civil Aspects of International Child Abduction art. 8, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 [hereinafter Hague Convention]; *see also id.* at 5 (Article 6). He filed his complaint in the district court for the Northern District of Texas on May 23, 2024. *See* 22 U.S.C. § 9003(a)–(b); *see also* Hague Convention, *supra*, at 7 (Article 9); 22 U.S.C. §§ 9002(9), 9006(a).

Following a two-day hearing, the district court concluded that Herrera Perez had "wrongfully retained" M.A.S. "in the United States within the meaning of the Hague Convention"—a conclusion that Herrera Perez does not contest. But the district court also determined that two exceptions apply such that the Convention does not mandate M.A.S.'s return to Mexico.

First, the district court concluded that more than one year had passed between M.A.S.'s wrongful retention in the United States and the filing of Sanchez Lozano's petition in district court. The district court also specifically found these facts: At the time of the hearing in late October 2024, M.A.S. had been in the United States for almost two years. He began school in the United States at the end of first grade; at the time of the district-court hearing, he was in third grade, having attended the same school since his

arrival in this country. While "[h]is learning was initially impeded by his lack of English language skills," he "ha[d] progressed" and even made the honor roll. M.A.S. had also made friends in his new environment. Herrera Perez, her new husband, and her children all live together in their home in Fort Worth, the boys have their own bedrooms, and the family attends church together. What is more, M.A.S. is a United States citizen. Based on these findings, the district court concluded that M.A.S. is well-settled in the United States. *See* Hague Convention, *supra*, at 7–8 (Article 12).

Second, the district court determined that Herrera Perez had shown that M.A.S.'s return to Mexico "would place him in an intolerable situation." *See id.* at 8 (Article 13(b)). This was so, the court reasoned, because Sanchez Lozano had "connections to the cartel" and to "drug traffickers" in Durango, Mexico. And, as the district court noted, Sanchez Lozano's brother "has been missing for twelve years because of his connection to the cartel." Specifically, the district court found that Sanchez Lozano's brother had disappeared due to, as Sanchez Lozano told Herrera Perez, the brother's affair with the wife of a Mexican cartel member.

Furthermore, the district court determined the following: Sanchez Lozano has a history of substance abuse, having regularly used cocaine since he was twenty-three years old. In fact, at the time of the hearing, he used cocaine regularly and was "a cocaine addict"—a finding that Sanchez Lozano does not now contest—and the cartilage on the inside of his nose was perforated because of his cocaine use. Sanchez Lozano even admitted that he used cocaine as recently as eight days before the district-court hearing in this case. Sanchez Lozano "never said [that] he would stop acquiring and using cocaine, or otherwise distance himself from the cartel and drug dealers, if M.A.S. were returned." Sanchez Lozano is also an alcoholic and "abuses" alcohol weekly. He once tried to give up drinking, but that only caused his

cocaine dependence to increase.  So, the district court concluded that "M.A.S. faces a grave risk if he were returned" to Mexico.

The district court therefore denied Sanchez Lozano's petition to return M.A.S.  Sanchez Lozano timely appealed.  *See* Fed. R. App. P. 4(a)(1)(A).

## II

## A

Sanchez Lozano has requested M.A.S.'s return under the Hague Convention.  In 1980, the Hague Conference on Private International Law adopted the Convention "in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010); *accord Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (quoting *Abbott*, 560 U.S. at 8).  Both the United States and Mexico are Hague Convention signatories.  *U.S. Hague Convention Treaty Partners*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html  (last  visited July 8, 2026).  The United States ratified the Hague Convention in 1988, and Congress "implemented" it the same year through the International Child Abduction Remedies Act.  *Lozano*, 572 U.S. at 6; *accord, e.g.*, *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020); *Abbott*, 560 U.S. at 9; *see* 22 U.S.C. §§ 9001–11.

"It is the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky*, 589 U.S. at 72 (quoting Hague Convention, *supra*, at 4 (preamble)).  The Convention thus "works to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Madrigal v. Tellez*, 848 F.3d 669, 673 (5th Cir. 2017) (quoting *England v. England*,

234 F.3d 268, 271 (5th Cir. 2000)).  To that end, the Convention has "two primary objectives: 'to secure the prompt return of children wrongfully removed to or retained in any'" state party to the Convention "and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"  *Lozano*, 572 U.S. at 4–5 (quoting Hague Convention, *supra*, at 4 (Article 1)); *accord Abbott*, 560 U.S. at 8.

The Convention's "central operating feature" is thus "the return of the child."  *Lozano*, 572 U.S. at 5 (quoting *Abbott*, 560 U.S. at 9).  "When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply."  *Abbott*, 560 U.S. at 9 (quoting Hague Convention, *supra*, at 7 (Article 12)) (citing Hague Convention, *supra*, at 5, 7 (Articles 4, 12)); *accord, e.g.*, *Monasky*, 589 U.S. at 70–71.  This "'provisional' remedy . . . fixes the forum for custody proceedings" in the country of the child's habitual residence.  *Monasky*, 589 U.S. at 72.

But "the Convention 'does not pursue that goal'" of return "at any cost."  *Guevara v. Castro*, 155 F.4th 353, 360 (5th Cir. 2025) (quoting *Hernandez v. Pena*, 820 F.3d 782, 786 (5th Cir. 2016)), *cert. denied*, 146 S. Ct. 1066 (2026); *accord, e.g.*, *Golan v. Saada*, 596 U.S. 666, 669 (2022); *Lozano*, 572 U.S. at 5 ("The return remedy is not absolute.").  "It recognizes that, in certain cases, 'the interests of the child may be better served by the child remaining' in [his] new environment, and it 'provides "several narrow affirmative defenses to wrongful removal."'"  *Guevera*, 155 F.4th at 360 (quoting *Hernandez*, 820 F.3d at 786).

The Convention's Article 12 "states the general rule that when a court receives a petition for return within one year after the child's wrongful

removal, the court 'shall order the return of the child forthwith.'" *Lozano*, 572 U.S. at 5 (quoting Hague Convention, *supra*, at 7 (Article 12)); *see Abbott*, 560 U.S. at 9. But "where the proceedings have been commenced after the expiration of the period of one year" from the wrongful removal or retention, a court "shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Hague Convention, *supra*, at 8 (Article 12); *see, e.g.*, *Lozano*, 572 U.S. at 5; *Guevara*, 155 F.4th at 360; *Hernandez*, 820 F.3d at 787. Similarly, Article 13(b) "excuses return . . . where there is a 'grave risk' that return would 'place the child in an intolerable situation.'" *Lozano*, 572 U.S. at 5; *see* Hague Convention, *supra*, at 8 (Article 13, 13(b)).

Courts construe these exceptions narrowly "lest their application undermine the express purposes of the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10509 (Mar. 26, 1986) [hereinafter Convention Text and Legal Analysis]; *see id.* at 10509–10; *see also* 22 U.S.C. § 9001(a)(4) (describing the exceptions as "narrow"); *Guevara*, 155 F.4th at 360 (referring to the Convention's "narrow affirmative defenses" (quoting *Hernandez*, 820 F.3d at 786)); *Rodriguez v. Yanez*, 817 F.3d 466, 472 (5th Cir. 2016) (similar); *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004) (similar). "[O]therwise, a broad interpretation would cause the exception[s] to swallow the rule and transform the Convention into an area for custody disputes." *Soto v. Contreras*, 880 F.3d 706, 710–11 (5th Cir. 2018) (quoting *Tavarez v. Jarrett*, 252 F. Supp. 3d 629, 640 (S.D. Tex. 2017)). And "the Convention prohibits courts considering convention petitions from 'adjudicating the merits of [the] underlying custody dispute[s].'" *England*, 234 F.3d at 271 (alterations in original) (quoting *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995)); *accord, e.g.*, *Golan*, 596 U.S. at 671 (quoting 22 U.S.C.

§ 9001(b)(4)); *Abbott*, 560 U.S. at 9; *Galaviz v. Reyes*, 95 F.4th 246, 257 (5th Cir. 2024).

B

Sanchez Lozano argues that the district court incorrectly applied the well-settled and grave-risk exceptions and thus wrongly denied his petition for M.A.S.'s return to Mexico. As Sanchez Lozano's counsel acknowledged at oral argument before us, Sanchez Lozano must prevail on both of those exceptions to succeed in this appeal. *See* Hague Convention, *supra*, at 8 (Article 13, 13(b)) (stating that if grave risk exists, that exception applies "[n]otwithstanding" any wrongful removal or retention under Article 12). Because the district court did not err in determining that a grave risk of physical or psychological harm to M.A.S. exists if he returns to Mexico, we need not and do not address the district court's conclusion that M.A.S. is well-settled in the United States, where he has lived with his family for at least two years, has made improvements in school, and has made friends.

A court "is not bound to order the return of the child" if the respondent establishes that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, *supra*, at 8 (Article 13, 13(b)). This exception "focuses on the risk of harm posed by the child's repatriation. It is not an invitation to determine whether custody with one parent would be in the best interest of the child." *Galaviz*, 95 F.4th at 257 (footnotes omitted); *accord* Convention Text and Legal Analysis, 51 Fed. Reg. at 10510.

Once a petitioner has established the wrongful removal or retention of the child, the burden shifts to the respondent opposing the child's return to establish an affirmative defense. *E.g.*, *Galaviz*, 95 F.4th at 251; *see* 22 U.S.C. § 9003(e). Thus, here, Herrera Perez "has the burden of establishing" the

grave-risk exception "by clear and convincing evidence."   22 U.S.C. § 9003(e)(2), (e)(2)(A).  "The [relevant] question is whether there is clear and convincing evidence that return would expose the child to a grave risk of harm, not whether a parent is a worthy custodian." *Galaviz*, 95 F.4th at 257. Herrera Perez must "show that the risk to the child is grave, not merely serious," *Soto*, 880 F.3d at 710 (quoting Convention Text and Legal Analysis, 51 Fed. Reg. at 10510)—"greater than would normally be expected on taking a child away from one parent and passing him to another," *Madrigal*, 848 F.3d at 676 (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)).  And a grave risk "involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Galaviz*, 95 F.4th at 256 (quoting *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013)).

We review the district court's factual findings for clear error.  *E.g.*, *England*, 234 F.3d at 270.  "A factual finding is not clearly erroneous as long as it is plausible in the light of the record as a whole."  *Sealed Appellant*, 394 F.3d at 342 (quoting *United States v. Powers*, 168 F.3d 741, 752 (5th Cir. 1999)).  Put differently, a finding will be clearly erroneous only "when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *accord, e.g.*, *A.P. ex rel. E.P. v. Pearland Indep. Sch. Dist.*, 158 F.4th 672, 676 (5th Cir. 2025) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).  Our court has not resolved whether we review the district court's legal conclusion that the grave-risk exception applies under either *de novo* or clear-error review.  *Galaviz*, 95 F.4th at 256; *cf. Guevara*, 155 F.4th at 361–63 (deciding only that the well-settled exception receives *de novo* review).  Nor need we resolve that question today: Because the exception applies under the

less deferential *de novo* review, it would also apply under the clear-error standard.

The district court's factual findings are not clearly erroneous. That court based its factual findings on testimony and evidence from the two-day hearing. In particular, Herrera Perez testified that "we're not safe" in Durango. Sanchez Lozano's counsel asked if that fear "c[a]me from anything." "Yes," Herrera Perez answered, "because the father of my children is involved with the narcos—the drug dealers, the drug traffickers that are there in Durango." Sanchez Lozano further testified that his brother had been missing for twelve years. The district court inquired if Sanchez Lozano had ever told Herrera Perez why his brother disappeared, and Herrera Perez replied, without objection from Sanchez Lozano, that Sanchez Lozano "had commented to me that his brother had been running around with a woman that was married and that woman was married to a narco." For his part, Sanchez Lozano disclaimed any friendship "with people who are drug dealers." But, as Sanchez Lozano acknowledged, he did buy drugs from various people.

Based on this testimony, the district court did not clearly err in finding that Sanchez Lozano has "ties to a Mexican drug cartel." Herrera Perez did not speculate about Sanchez Lozano's cartel associations. *Cf. Galaviz*, 95 F.4th at 256 ("Mere speculation does not meet the clear and convincing burden." (citing *Kinnear-Weed Corp. v. Humble Oil & Refin. Co.*, 441 F.2d 631, 636 (5th Cir. 1971))). And, perhaps more to the point, the district court was entitled to believe Herrera Perez's testimony. *See, e.g.*, *Ali v. Stephens*, 822 F.3d 776, 783 (5th Cir. 2016); Fed. R. Civ. P. 52(a)(6).

The district court also found that Sanchez Lozano is a "regular user of cocaine and a cocaine addict," "[b]ased on an evaluation of the witnesses' testimony." As Sanchez Lozano admitted, and as the district court found,

Sanchez Lozano had used cocaine for eighteen years—indeed, he did so "as recently as eight days before" the district-court hearing—and "regularly acquire[d] it to satisfy his addiction." "He admitted to taking cocaine monthly," but Herrera Perez testified that Sanchez Lozano "uses more frequently." The district court also found that Sanchez Lozano "abuses alcohol weekly" and that when he has "attempted to give up alcohol, his cocaine[] depend[e]nce increased." The district court thus determined that Sanchez Lozano was also an alcoholic. Before us, Sanchez Lozano disputes none of these findings.

Simply put, the district court did not err in concluding that, because return to Mexico would expose M.A.S. to close connections to the cartel and his father's substance abuse, a grave risk exists that returning M.A.S. to Mexico would result in his physical or psychological harm or place him in an intolerable situation. *See* Hague Convention, *supra*, at 8 (Article 13(b)). We AFFIRM.